Bradley J Williams, Esq. (I.S.B. #4019)
David A. Eisele, Esq. (I.S.B. #9277)
WRIGHT LAW OFFICES, PLLC
Attorneys at Law
477 Shoup Avenue, Suite 109
P. O. Box 50578
Idaho Falls, ID 83405
Email: brad@wrightlawidaho.com
       dave@wrightlawidaho.com
       icourt@wrightlawidaho.com
Telephone: (208) 523-4433
Facsimile: (208) 523-4400

Attorneys for Defendant
Golden Valley Natural, LLC

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALEXIS JOHNSON, | Case No. 4:19-CV-00105-BLW |
| Plaintiff, | **DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF** |
| vs. | |
| GOLDEN VALLEY NATURAL, LLC, | |
| Defendant. | |

COMES NOW Defendant, Golden Valley Natural, LLC, by and through its counsel of record, and submits this *Trial Brief*.

### INTRODUCTION AND CLAIMS

Plaintiff Alexis Johnson ("Johnson") has sued Defendant Golden Valley Natural, LLC ("GVN") for alleged "racial and national origin discrimination, disparate treatment, hostile work environment and sexual harassment." See, *Complaint and Demand for Jury Trial* at p. 5 (Mar. 27, 2019).

Johnson's claim for sexual harassment is based on her allegation that a co-worker, whom Johnson merely refers to as "Andrew," said to her: "I hear that bigger girls give the best blow jobs. Can you verify that?" Johnson alleges that she responded to Andrew by telling him that his comment was inappropriate, and further testified that Andrew never spoke to her again during the remainder of her employment.

Next, Johnson's claim for disparate treatment (discrimination) is based on her allegation that her "supervisor," Julio Barrientos: (1) sent Johnson home early from work on two occasions; (2) once told Johnson, "White people can't do anything right;" and (3) once told Johnson to go home early and had another employee (an unnamed Hispanic-female) perform the work Johnson had been doing immediately before she was sent home.

Finally, Johnson's hostile work environment claim is based on her allegation that "team leaders," "supervisors" and co-workers called her names in Spanish (i.e., "puta" ("whore"); "pinche Gringa" ("fucking white woman"); and "pinche Americana" ("fucking American")) between 20 and 30 times per day, beginning the very first day of her employment, in November 2017. Johnson testified that these "supervisors" and co-workers, at times, were obviously trying to be funny, and at other times were being "harsh." Johnson further testified that she "got used" to these comments after the first few weeks of her employment.

## STATEMENT OF FACTS

Johnson began working for GVN on November 6, 2017, as a "Production Line Worker" at its processing plant in Shelley, Idaho, for $9.00 per hour as a "part-time" employee. GVN produces meat snacks, such as beef jerky.

GVN's Human Resources Department ("H.R.") holds a mandatory orientation for all new employees. At orientation, new employees are given a copy of GVN's Employee Handbook.

Employees are required to sign an Acknowledgment form verifying that they have read and understand the policies in the Handbook, and that they agree to comply with the policies. Johnson signed the Acknowledgment form when she was hired.

GVN is an "Equal Opportunity" employer and has a written, "zero" tolerance policy against "workplace discrimination and/or harassment." The Handbook provides in pertinent part:

> Golden Valley Natural is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment.

The Handbook contains mandatory "reporting" policies, which require all employees to report any instances of "discrimination and/or harassment" to their "Supervisor" or H.R. under Section 703:

> If you experience or witness sexual or other unlawful harassment at work, report it immediately to your supervisor. If your supervisor is unavailable or you believe it would be inappropriate to discuss it with your supervisor, you should immediately contact the Personnel Department or any other member of management. There will not be punishment or reprisal if you report sexual harassment or ask questions or raise concerns about it.

The H.R. Department also provides a basic training regarding its anti-discrimination/harassment policies and reporting requirements during the orientation for all new employees.

When Johnson began her employment, there were three separate shifts: (1) the "Day shift," which ran from 6:30 a.m. to 3:00 p.m.; (2) the "Swing" or "Night" shift, which ran from 3:00 p.m. to 11:30 p.m.; and (3) the "Midnight shift," which ran from 10:00 p.m. to 6:30 a.m. Johnson was assigned to the Swing shift, per her request, so that she could continue attending high school.

The Production Department is divided into two sides: the "raw" or "Blue" side, where raw-meat products are prepared, marinated, frozen and sliced; and the "cooked" or "White" side. On any given shift, there are multiple production "lines" consisting of approximately four to six employees. Johnson was assigned to the raw side, which she had hoped to avoid because it was cold.

For several years leading up to 2017, GVN hired a surplus of employees. That surplus was substantially reduced through a "Reduction in Force," which occurred in or about October 2019, whereby several-hundred employees were laid off. This Reduction in Force occurred after Johnson voluntarily terminated her employment in February 2018.

Work at GVN is physically demanding. Given the nature of the industry, hourly pay, hot and cold temperatures, and the strenuous, physical demands of the job, the majority of GVN's employees have historically been Hispanic-males. Despite this, GVN is an Equal Opportunity Employer and offers employment to any willing, qualified applicants, regardless of race, national origin or gender.

During production, there are times when a production line will complete processing the available meat products prior to completing a shift. In such situations, either a GVN "Supervisor" or "Team Leader" will see if there is other work available for a team that has run out of work by moving them to a different area in production (e.g., from the "Blue" to the "White" side).

Such work transfers typically occur towards the end of a shift. If, thereafter, there is insufficient work for a "line" or team in the area where they have been temporarily transferred to, a Supervisor or Team Leader will begin to send employees home before finishing their scheduled shift. Although there are no set rules that govern which employees will be released

early, the Supervisor/Team Leader has discretion to release those employees with the least seniority and/or experience.

As with all Production Line employees, Johnson worked with a "team" that was usually comprised of approximately four to six employees. Each team has a "Team Leader," who works with and oversees and organizes the team's work. Team Leaders lack authority to hire, fire, demote, promote, or lower the pay of employees/members of their team. The only relevant "Supervisors" at GVN during Johnson's brief employment period (i.e., individuals who did have authority to hire, fire, demote, promote, etc., employees like Johnson), were the "Plant Manager," Kevin Zundel, and Luis Chavez, who was the Supervisor for the Swing shift.

In or about January 2018, Johnson was working on the raw side of production. There were several occasions in January when her team completed their available work, and were thus moved to the cooked side of production for a few hours, towards the end of a shift.

On one such occasion, Johnson alleges that she was moved to work under an employee named "Andrew." Johnson didn't know Andrew's last name, but assumed (incorrectly) that he was a Supervisor or Team Leader. (GVN's records indicate that there were only two employees named Andrew during Johnson's employment: Andrew Barrera and Andrew Reyes. However, neither Andrew Barrera nor Andrew Reyes were ever Supervisors or Team Leaders.)

Towards the end of her shift, Johnson claims that she was "chit-chatting" with Andrew, when he allegedly said: "I hear that bigger girls give the best blow jobs. Can you verify that?" Johnson replied by telling Andrew his remark was "wrong" and promptly left. Johnson then went on break. While in the break room, Johnson allegedly visited with another co-worker, Alma Rocha, who was a good-acquaintance and who happened to be in the breakroom. *Depo. of Alexis Johnson* at p. 42:2-4. Rocha worked in the Quality Control Department ("QC"), and had no

5- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

supervisory-authority over anyone in Production. Furthermore, QC is not in the Chain of Command for reporting harassment complaints under GVN's written policies. When Johnson was asked at her deposition whether she sought Rocha in order to lodge a harassment "report," Johnson testified: "No. I had just r[u]n into her." *Johnson Depo.* at p. 43:3 (Dec. 2, 2019).

Johnson claims that she told Rocha about Andrew's alleged comment because she "…knew that [Rocha] was higher up…" and "because [Rocha] was the closest one to the situation." *Id.* at p. 42: 13-14, 16-19. Johnson further testified that when she told Rocha about the alleged comment, Rocha responded by saying, "He does that to everybody," to which Johnson replied, "It's still not right." *Id.* at 43:15-16, 44:9. After this brief conversation, Rocha "…just wandered off." *Id.* at 44:18-20. Rocha has denied that Johnson told her that an employee named Andrew made the alleged, inappropriate remark.

Following her break, Johnson returned to work. But, instead of going back to the same line (with Andrew), she approached a Team Leader, whose name she didn't recall, and allegedly told him "…there was a situation in my—at my previous line and I would just like to work on a different line," and that he said that would be "fine." *Id.* at 46:20-25.

Several weeks after Andrew made the purported remark to Johnson, she moved to the cooked side once again, on a line where Andrew was working. This time, though, Andrew "didn't say anything" to Johnson. *Id.* at 49:18. In fact, Johnson said that she "…didn't have [any] communication [with Andrew]" thereafter. *Id.* at 50:2.

Johnson alleges in her *Complaint* that from the beginning of her employment, "Spanish workers and Supervisors" called her names like "puta," which is Spanish for "whore." This allegedly happened "20 to 30" times every day. Johnson also claims these co-workers called her "pinche Gringa" or "pinche Americana," which is Spanish for "fucking white lady," and

6- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

"fucking American," respectively. Johnson alleges that she was also called these names "20 to 30" times per day. Johnson testified that there were approximately seven to 10 employees who were calling her such names, and it was "mostly…some of the same people…" who did so, but sometimes other employees "that [she had] never seen before," called her those names, too. *Id.* at 56:3-5. In her *Complaint*, Johnson alleges: "Almost everyone at the Plant called [me] these names." *Compl. and Demand for Jury Tr.* at ¶20 (Mar. 27, 2019). By "everyone in the Plant," Johnson meant "the area [she] was at," presumably referring to both the raw and cooked sides of production, which were the "areas" that she worked.

Johnson was only able to identify two of the employees who allegedly called her names by their full-names: Diana Lopez and Leo Lopez. Johnson also claims that a "supervisor" named "Julio," who worked on the cooked side, called her names on the two occasions when she worked on his "line." Although Johnson doesn't know Julio's last name, GVN's records show that the only "supervisor" working on the Swing shift on the "White" side in January 2018 was Julio Barrientos. Mr. Barrientos, however, was only a Team Leader, not a Supervisor.

Johnson also testified that there were times when the individuals who made the alleged comments "…would be, like, smiling to where you could tell they were trying to be funny," but that there were other times when "it was just straight-up harsh." *Johnson Depo.* at 60:9-11.

Johnson testified that during the first two to three weeks of her employment, when the "Spanish" workers allegedly first started calling her "puta," she asked them why they "called [her] that," but she didn't speak Spanish and couldn't understand their response. *Johnson Depo.* at 56:14-18. After her first three weeks on the job, Johnson testified that she "just got used to" the alleged name-calling." *Id.* at 56:20-21.

Johnson alleges that she was "the only white woman under 40 working at [GVN's] plant…" during her employment. Johnson is incorrect: there were 17 other "white-female" employees who worked in production at the same time that Johnson did.

Johnson also alleges that she was "treated differently" than other GVN employees because she was a white-female. Specifically, Johnson claims there were two instances in January 2018, when she was moved to the cooked side towards the end of her shift, where she worked under Team Leader Julio Barrientos. The first time, Johnson claims that she was "passing handfuls of meat through a scanner" and that Julio didn't think she was performing the job in a satisfactory manner and told her, "White people can't do anything right."

After making this comment, Julio told Johnson to "go home," which was about three hours before the end of her shift. Johnson asked Julio why he was sending her home, but he just repeated the words, "Go home." Johnson didn't go home, though, and instead reported the alleged incident to her shift Supervisor, Luis Chavez, "since he was the one who managed most of everything during the shift." *Id.* at 74:5-7. Johnson testified that she told Chavez, "I don't understand why I got sent home." *Id.* at 72:19-22. Chavez said he would "take care" of the situation, but "For now, just go home." *Id.* Johnson testified that she spoke to Chavez the following day, and that he said that "the situation had been taken care of." *Id.* at 74:22-23.

Sometime after the first alleged incident with Julio in January 2018, Johnson was moved again to the cooked side under Julio. On this occasion, Johnson was allegedly filling bags and weighing them, but Julio "would like, double check it and triple check it…" and "have other people" "empty out [the bags] and redo it." *Id.* at 75:20-76:2. The "other people" were "other line workers" working on the line. Johnson allegedly asked Julio why he and the other line workers were re-weighing her bags, but he "just shrugged his shoulders" and said "You know

8- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

what, just go home." *Id.* at 76:3-25. Johnson claims that she again told Chavez about being sent home early by Julio, and that Chavez said that she wouldn't have to work on Julio's "line anymore, even if [she] went on his side," and to "Just go home for now." *Id.* at 77:4-11. Johnson testified that she asked Chavez: "How am I going to make up the hours?" *Id.* at 77:25-78:3. His alleged reply was: "You're just going to have to take a loss." *Id.*

Johnson didn't recall the dates that the two alleged incidents with Julio occurred, just that it happened sometime in early January. GVN's payroll records reveal that, in addition to Johnson, other employees from the raw side, who had been moved to the cooked side towards the end of the shift on January 4, for example, "clocked out" prior to the end of the Swing shift, including a Hispanic-male named Sergio Cortez.

In addition to the "other line workers" who were allegedly re-weighing and emptying the bags Johnson had already weighed, Johnson alleges that Julio asked a Hispanic-female, who had just started working that day, to "replace" her on the line. Johnson had seen this female at her high school, but didn't know her name.

Following the second alleged incident with Julio (which appears to have been on January 6), Johnson continued working for the next four weeks without any further alleged incidents or complaints. In fact, Johnson continued working until February 6, 2018, when she "just stopped going into work." *Id.* at 85:4.

On February 9, 2018, Chavez completed an "Employee Quit Form" indicating "3 days no call, no show!" Chavez listed "3/6/18" as the "Termination Date," which was the last day Johnson worked at Golden Valley.

## CLAIMS AND AUTHORITIES

**I.   JOHNSON'S ALLEGATIONS DO NOT IMPLICATE ANY "SUPERVISORS" FOR PURPOSES OF VICARIOUS LIABILITY UNDER TITLE VII.**

Throughout this litigation, Johnson has colloquially referred to some of the GVN employees that allegedly harassed her as "supervisors." Johnson is incorrect, however, as none of the individuals she's identified were Supervisors, for purposes of determining vicarious liability under Title VII.

### A.   Harassment by a Co-Worker Versus a "Supervisor."

Under Title VII, "it is…important whether an alleged harasser is a 'supervisor' or merely a co-worker." *Vance* v. *Ball State University*, 570 U.S. 421, 430, 133 S.Ct. 2434, 2443 (2013). "[A]n employer is directly liable for an employee's unlawful harassment if the employer was **negligent** with respect to the offensive behavior. [Citing *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998).] Courts have generally applied this rule to evaluate employer liability **when a co-worker harasses the plaintiff**." *Id.* (emphasis added).

Conversely, "an employer is *vicariously liable* 'when *a supervisor takes a tangible employment action*,'…*i.e.*, 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 429, 2442 (citing *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 118 S.Ct. 2257 (1998) and *Faragher*) (emphasis added). Alternatively, an "employer can be *vicariously liable* for [a] *supervisor's creation of a hostile work environment* if the employer is unable to establish an affirmative defense." *Id.* (emphasis added). Concerning that affirmative defense:

10- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

>an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities that were provided.

*Id.* at 430, 2442.

## B. Employee Hierarchy at GVN ("Team Leaders" Versus "Supervisors").

Team Leaders have limited authority to "supervise" and direct their respective team of Production Line Laborers, but have no power to hire, fire, demote, promote, or decrease an employee's pay. Consequently, a Team Leader doesn't qualify as "supervisor" under *Vance*. Assuming, therefore, that a Team Leader harassed Johnson, GVN could not be held *vicariously liable* therefore.

## C. There Is No Evidence That Johnson Was Harassed by Any "Supervisors."

In her briefing in opposition to GVN's *Motion for Summary Judgment*, Johnson argued that GVN "is vicariously liable for workplace harassment where an 'actionable hostile environment was created by one or more supervisors **with immediate authority over [her]**,'" citing to the Ninth Circuit case, *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008). See, *Plaintiff's Memorandum in Response to Motion for Summary Judgment* at p. 4 (May 15, 2020). This is an inaccurate statement of the law. As noted above, the inquiry relevant to "supervisors" doesn't pertain to whether the alleged supervisor had "immediate authority" over Johnson but, instead, whether the supervisor had been "empowered" by GVN to take tangible employment action against Johnson.

The U.S. Supreme Court made this clear in 2013, five years after the Ninth Circuit's decision in *Davis*. See, *Vance*, 570 U.S. at 431, 133 S.Ct. at 2443 (2013). *Vance*, in fact, reiterated an earlier Supreme Court decision acknowledging that "it would go too far…to make

11- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

employers strictly liable whenever a 'supervisor' engages in harassment that does not result in a tangible employment action." *Id.* at 430, 2442. The Court in *Vance* held that that the standard relied upon by Johnson was too amorphous, confusing, and difficult to ascertain for courts and juries alike.[1] Therefore, *Vance* created a bright-line rule concerning who a "supervisor" is for purposes of vicarious liability:

> The interpretation of the concept of a supervisor that we adopt today is one that can be readily applied. In a great many cases, it will be known even before litigation is commenced whether an alleged harasser was a supervisor, and in others, the alleged harasser's status will become clear to both sides after discovery. And once this is known, the parties will be in a position to assess the strength of a case and to explore the possibility of resolving the dispute. Where this does not occur, supervisor status will generally be capable of resolution at summary judgment. By contrast, under the approach advocated by petitioner and the EEOC, supervisor status would very often be murky—as this case well illustrates.

*Id.* at 441, 2449. In this case, Johnson could only identify four of her alleged harassers by name: Andrew Barrera, Julio Garcia Barrientos, Diana Lopez and Leo Lopez. Andrew, Diana, and Leo were never Supervisors or even Team Leaders. Similarly, Julio was never a Supervisor, although he was a Team Leader on the "White" side during Johnson's brief employment at GVN. As such, the question of vicarious liability is not an issue in the case, and the jury should be instructed accordingly.

## II. THERE IS INSUFFICIENT EVIDENCE TO SUPPORT JOHNSON'S HOSTILE WORK ENVIRONMENT CLAIM.

Sexual harassment is "actionable" when it is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*

---

[1] For example: "The ability to direct another employee's tasks is simply not sufficient [to impose vicarious liability]. Employees with such powers are certainly capable of creating intolerable work environments,…but so are many other co-workers. Negligence provides the better framework for evaluating an employer's liability when a harassing employee lacks the power to take tangible employment actions." *Vance*, 570 U.S. at 439, 133 S.Ct. at 2448 (2013).

12- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

*Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986) (internal citation omitted). "[N]ot all workplace conduct that may be or described as 'harassment' affects a 'term, condition or privilege' of employment within the meaning of Title VII." *Id.* For instance, the "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.*; see also *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

Determining whether an environment is "'hostile' or 'abusive'" requires "looking at all [of] the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371 (1993). Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283-84, 141 L.Ed.2d 662 (1998). Thus, Johnson must adduce evidence that her working environment was both "subjectively and objectively perceived as hostile/abusive." *Brooks* v. *City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). An objective hostile/abusive environment is one that "a reasonable person" would find to be hostile or abusive. *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (1993).

"[A]n isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship." *Brooks*, 229 F.3d at 924 (9th Cir. 2000). "If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe," not just "highly offensive." *Id.* at 926.

As noted, Andrew was not a Supervisor. Thus, in cases involving harassment by co-workers, Johnson must prove that GVN failed to exercise "reasonable care to prevent and correct promptly any sexual harassment." *Davis*, 520 F.3d at 1096 (9th Cir. 2008). GVN "can be held liable only where 'its own negligence is a cause of the harassment.'" *Swenson* v. *Potter*, 271 F..3d 1184, 1191 (9th Cir. 2001). Liability under Title VII "is direct, not derivative: An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct." *Id.* at 1191-91. And, GVN "cannot be held liable for misconduct of which it is unaware." *Id.* at 1192. Instead, an "employer's liability, if any, runs only from the time it 'knew or should have known about the conduct and failed to stop it.'" *Id.*

### III.   THERE IS INSUFFICIENT EVIDENCE TO SUPPORT JOHNSON'S DISPARATE TREATMENT CLAIM.

Title VII prohibits discrimination "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's…[race, national origin or sex]." 42 U.S.C. § 2000e-2(a)(1). Johnson has to prove that: "(1) she belongs to a protected class, (2) she was qualified for the position in question, (3) she was subject to an adverse employment action, and (4) similarly situated individuals outside her protected class were treated more favorably." *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 807, 93 S.Ct. 1817, 1826-27, 36 L.Ed.2d 668 (1973). "A claim of disparate treatment requires direct or circumstantial proof of discriminatory motive." *Harris* v. *Treasure Canyon Calcium Company*, 132 F.Supp.3d 1228, 1243 (D. Idaho 2015).

An "adverse employment action" is an action that "materially affects the compensation, terms, conditions, or privileges of employment." *Campbell*, 892 F.3d at 1012 (9th Cir. 2018). Assigning an employee with "more, or more burdensome, work responsibilities…" than

similarly situated employees is one example of an adverse employment action. *Davis*, 520 F.3d at 1089 (9th Cir. 2008). Other examples include: "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Lambert* v. *Trump International Hotel and Tower*, 304 F.Supp.3d 405, 417 (2d Cir. 2018).

    **IV.    JOHNSON CANNOT ESTABLISH HER CLAIM FOR CONSTRUCTIVE DISCHARGE.**

"[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks*, 229 F.3d at 930 (9th Cir. 2000). The bar for constructive discharge is "high." *Poland*, 494 F.3d at 1184 (9th Cir. 2007). That is because "federal antidiscrimination policies are better served when the employee and the employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Id.* Hence, an employee who quits without giving their employer a "reasonable chance" to resolve the issue has not been constructively discharged. *Tidwell* v. *Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996) (cited with approval in *Poland* v. *Chertoff*, 494 F.3d 1174 (9th Cir. 2007)).

Johnson failed to give GVN a reasonable chance to resolve her alleged complaints. For example, she never reported Andrew's inappropriate remark to a member of management or H.R., as required by the Employee Handbook (which she acknowledged, with her signature,

15- DEFENDANT GOLDEN VALLEY NATURAL, LLC'S TRIAL BRIEF

having received, read and reviewed), and as she was told during her orientation. Similarly, she never reported to management or H.R. that her co-workers were calling her names that she found offensive and that she was bothered by them. Johnson therefore failed to give GVN a fair opportunity to address her concerns, before she voluntarily quit, without any advance notice, in February 2018.

Johnson cannot reasonably contend that being sent home early from work twice by Julio contributed, or otherwise is relevant to, her claim for constructive discharge. Johnson's own testimony is that she spoke to Luis Chavez after Julio told her to go home early on both occasions, and that on the second occasion, Chavez told her that she would never have to work with Julio again. There is no evidence, nor any allegation, that Johnson ever did have to work with Julio again, and thus, it would be disingenuous for her to argue that being sent home early on two occasions constitutes or otherwise contributed to constructive discharge.

DATED this 24th day of August, 2020.

WRIGHT LAW OFFICES, PLLC


By: /s/ Bradley J Williams
BRADLEY J WILLIAMS
Attorneys for Defendant Golden Valley Natural, LLC

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that I am a licensed attorney in the State of Idaho, with my office in Idaho Falls, and that on the 24th day of August, 2020, I served a true and correct copy of the following described document on the person listed below by the method indicated below.

**DOCUMENTATION SERVED:** DEFENDANT'S TRIAL BRIEF

| | |
|---|---|
| Jacob S. Wessel, Esq.<br>THOMSEN HOLMAN WHEILER PLLC<br>2635 Channing Way<br>Idaho Falls, Idaho 83404<br>Email: wessel@thwlaw.com<br>*Attorneys for Plaintiff Alexis Johnson* | ☐ U.S. First Class Mail<br>☐ Overnight Mail<br>☐ Hand Delivery<br>☐ Facsimile (208-522-1277)<br>☐ E-mail<br>X E-file |

                                /s/ David A Eisele
                                DAVID A EISELE